# UNITED STATES COURT OF APPEALS

# FOR THE NINTH CIRCUIT

APPEAL NO. 12-15603
D.C. No.:  2:11-CV-1549-PMP-VCF

**On Appeal from the United States District Court for Nevada, Las Vegas**

**APPELLANTS' OPENING BRIEF**

DAVID ROY STILWELL; LILLIAN "TIGER LILY" GONZALEZ; MIKE "BONES" DAVIS; VICTOR "DOC" MOSS; KAREN JURASINSKI; RICHARD "DIRTY RICK" POLLARD; BURL DEAN BOLTON; JAMES B. CANFIELD; LUANN "CHEYENNE" FOSCHI; TIMOTHY FARRELL; BRIAN KATZ; CARLOS AUGUSTINE BOLTON; on behalf of themselves and others similarly situated;

                    Plaintiffs – Appellants

v.

CLARK COUNTY, Nevada; CITY OF BOULDER CITY; CITY OF NORTH LAS VEGAS; CITY OF HENDERSON; CITY OF MESQUITE; CITY OF LAS VEGAS,

                    Defendants – Appellees.

Travis N. Barrick, NBN 9257
GALLIAN WILCOX WELKER
OLSON & BECKSTROM, LC
540 E. St. Louis Avenue
Las Vegas, Nevada 89117
Telephone: (702) 892-3500
Facsimile:  (702) 386-1946
tbarrick@gwwo.com
Attorneys for Plaintiffs - Appellants

Gary W. Gorski, CBN 166526
Attorney at Law
1207 Front Street, Suite 22
Sacramento, CA 95814
Telephone: (916) 965-6800
Facsimile:  (916) 965-6801
usrugby@pacbell.net
Attorneys for Plaintiffs - Appellants

# <u>TABLE OF CONTENTS</u>

PAGE NO.

I.      TABLE OF AUTHORITIES…………………………………………iv
II.     JURISDICTIONAL STATEMENT…………………………..…..vii
III.    STATEMENT OF THE ISSUES……………………………….…..1
IV.     STATEMENT OF THE CASE……………………………………..2
V.      STATEMENT OF THE FACTS…………………………………...5
        A. Applicable Statutes and Administrative Codes……………………..5
        B. Factual Allegations…………………………………………………..8
VI.     SUMMARY OF THE ARGUMENT……………………….………9
VII.    STANDARD OF REVIEW…………………………………………10
VIII.   ARGUMENT………………………….…………………………..11
        A.     The District Court erred (i) in dismissing the Plaintiffs' Complaint
               with prejudice and, alternatively, (ii) in denying leave to file an
               amended pleading…………………………………………………11
               1. Order Dismissing with Prejudice……………………………11
               2. Denial of Leave to Amend…………………………………..12
        B.     The Plaintiffs have a viable claim for relief under the Fourth
               Amendment against Defendants under 42 U.S.C. § 1983, as pled in
               the First Cause of Action…………………………………………13
        C.     Whether Plaintiffs have a viable claim for relief under the Equal
               Protection Clause of the Fourteenth Amendment against
               Defendants under 42 U.S.C. § 1983, as pled in the Second Cause
               of Action…………………………………………………………16
               1. Disparate Treatment…………………………………………17
               2. Liberty Interest………………………………………………18
        D.     Whether the Plaintiffs have viable state law claims for Malicious
               Prosecution and Abuse of Process, as pled in the Third and Fourth
               Causes of Action…………………………………………………22
        E.     Whether the Plaintiffs have a viable claim under the First and
               Fourteenth Amendments against Defendants under 42 U.S.C. §
               1983……………………………………………………………….22
        F.     Whether the Plaintiffs have a viable claim for relief under the
               Privileges and Immunities Clause of the Fourteenth Amendment
               against Defendants under 42 U.S.C. § 1983……………………..23
               1. Whether the Defendants' arbitrary and discriminatory
                  enforcement of Nevada's Helmet Law and the CFR Standard

unjustifiably violates the Plaintiffs' right to travel under the Privileges and Immunities Clause……………………………23

2.  A heightened standard of review should be applied to a state statute and code that specifically impacts fundamental rights expressly protected by the Privileges and Immunities Clause and incorporated into the Fourteenth Amendment for additional reasons of travel…………………………………………..35

G.   Whether this Court should order, for remand, assessment of 42 U.S.C. § 1988 interim litigation expenses and counsel fees for Appellants prior to trial on the merits of the remaining factual and legal questions…………………………………………………38

IX.   CONCLUSION…………………………………………….…..38

REQUEST FOR ATTORNEY FEES………………………………………40
ATTORNEY'S CERTIFICATE OF COMPLIANCE ………………………40
CERTIFICATE OF SERVICE BY CM/ECF……………..……………..…..41

| TABLE OF AUTHORITIES | |
|---|---|
| **CASES** | **PAGE NOS.** |
| Adamson v. California, 332 U.S. 46 (1947). | 32 |
| Ashcroft v. Iqbal, 129 S. Ct. 1937 (2009). | 4 |
| Attorney General of New York v. Soto-Lopez, 476 U.S. 898, 903, 106 S.Ct. 2317, 90 L.Ed.2d 899 (1986). | 23 |
| Barron v. Baltimore, 32 U.S. (7 Pet.) 243, 8 L. Ed. 672 (1833). | 29 |
| Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007). | 4 |
| Board of Regents v. Roth, 408 U.S. 564, 569, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). | 26 |
| Bradwell v. The State, 83 U.S. 130 (1873). | 3 |
| Brown v. Board of Ed., 347 U.S. 483 (1954). | 28 |
| City of Cleburne v. Cleburne Living Center Inc., 473 U.S. 432 (1985). | 16 |
| Dang v. Cross, 422 F3d 800 (9th Cir. 2005). | 11 |
| District of Columbia v. Heller, 554 U.S. 570 (2008). | 24 |
| Dittman v. California, 191 F.3d 1020, 1029 (9th Cir.1999). | 25 |
| Doe v. Bolton, 410 U.S. 179 (1973). | 31 |
| Doe v. United States, 58 F.3d 494 (9th Cir. 1995). | 10, 13 |
| Gallegos v. State, 163 P.3d 456 (2007). | 14, 15 |
| Gallo v. U.S. Dist. Court For Dist. of Arizona, 349 F.3d 1169, 1178 (9th Cir.2003) | 26 |
| Gideon V. Wainwright, 372 U.S. 335 (1963). | 19 |
| Grayned v. City of Rockford, 408 U.S. 104, 92 S.Ct. 2294 (1972). | 13 |
| Guillory v. County of Orange, 731 F.2d 1379 (9th Cir. 1984). | 16 |
| Haddad v. Lockheed Calif. Corp., 720 F2d 1454 (9th Cir. 1983). | 11 |
| Hartford Fire Ins. Co. v. California, 509 U.S. 764 (1993). | 10, 12 |

| CASES | PAGE NOS. |
|---|---|
| Hughes v. Rows, 449 U.S. 5 (1980). | 10 |
| Employment Division v. Smith, 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990). | 37 |
| Kansas v. United States, 16 F.3d 436, 442 (D.C.Cir.1994). | 24 |
| Kisor v. Johns–Manville Corp., 783 F2d 1337 (9th Cir. 1986). | 11 |
| Kolender v. Lawson, 461 U.S. 352, 358, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1983). | 15 |
| Kuzinich v. County of Santa Clara, 689 F.2d 1345 (9th Cir.1983). | 16 |
| Mapp v. Ohio, 367 U.S. 643 (1961). | 31, 32 |
| Monarch Travel Servs., Inc. v. Associated Cultural Clubs, Inc., 466 F.2d 552, 554 (9th Cir.1972). | 24 |
| Moore v. East Cleveland, 431 U.S. 494 (1977). | 32 |
| Obrey v. Johnson (Obrey I), 400 F.3d 691 (9th Cir.2005). | 11, 12 |
| Patton v. United States, 281 U.S. 276, 298 (1930). | 27 |
| Peloza v. Capistrano Unified School Dist., 37 F.3d 517 (9th Cir. 1994). | 10, 12 |
| Planned Parenthood V. Casey, 505 U.S. 833, (1992). | 18 |
| Plessy v. Ferguson, 163 U.S. 537 (1896). | 29, 34 |
| Poe v. Ullman, 367 U.S. 497 (1961). | 19, 32 |
| Presser v. Illinois, 116 U.S. 252, 29 L. Ed. 615, 6 S. Ct. 580 (1886). | 29, 30, 31 |
| Roe v. Wade, 410 U.S. 113 (1973). | 32 |
| Saenz v. Roe, 526 U.S. 489 (1999). | 24, 31 |
| Shapiro v. Thompson, 394 U.S. 618 (1969). | 31 |
| Silvar v. Dist. Ct., 122 Nev. 289, 292, 129 P.3d 682 (2006). | 14 |
| Silveira v. Lockyer, 312 F.3d 1052 (9th Cir. 2002). | 15, 35 |
| Slaughter-House Cases, 83 U.S. 36 (1873). | 31, 32, 33, 34 |

| CASES | PAGE NOS. |
| --- | --- |
| Stone v. Travelers Corp., 58 F.3d 434 (9th Cir. 1995). | 10 |
| U.S. v. Guest, 383 U.S. 745 (1966). | 31 |
| United States for Use & Benefit of Reed v. Callahan, 884 F.2d 1180, 1185 (9th Cir. 1989). | 38 |
| United States v. Cruikshank, 92 U.S. 542, 23 L. Ed. 588 (1876). | 28, 29, 32, 33, 34 |
| United States v. Martinez-Fuerte, 428 U.S. 543, 554, 96 S.Ct. 3074, 3081, 49 L.Ed.2d 1116 (1976). | 14 |
| United States v. Mendenhall, 446 U.S. 544, 554, 100 S.Ct. 1870, 1877 (1980). | 14 |
| Village of Willowbrook v. Olech, 120 S.Ct. 1073, 145 L.Ed.2d 1060 (2000). | 16 |
| Wedges/Ledges of California, Inc. v. City of Phoenix, 24 F.3d 56 (9th Cir.1994). | 16, 26 |
|  |  |
| **U.S. STATUTES & CODES** | **PAGE NOS.** |
| 42 U.S.C. § 1983 | 1, 11, 13, 16, 22, 23 |
| 42 U.S.C. § 1988 | 38 |
| 49 C.F.R. §571.218 | 5, 12 |
| Title 49, United States Code Chapter 301 Motor Vehicle Safety | 6 |
|  |  |
| **STATE STATUTES & CODES** | **PAGE NOS.** |
| NRS 41.031(1) | 3 |
| NRS 176.115 | 11 |
| NRS 486.231 | 2, 5 |
| NAC 486.015 | 5 |

## II.    **<u>JURISDICTIONAL STATEMENT</u>.**

Subject matter jurisdiction in the District Court was based on 28 U.S.C. § 1331 & 1342, authorized by 42 U.S.C. § 1983.

This Court has jurisdiction over the appeal from the final Order on the Defendants' motions to dismiss in favor of Defendants, filed on February 21, 2012, under 28 U.S.C. § 1291. (CR #42, ER00005)

Judgment was entered on February 21, 2012. (CR #43, ER00004).

Notice of Appeal timely filed on March 19, 2012. (CR #46, ER00001).

### III.   **STATEMENT OF THE ISSUES.**

1. Whether the District Court erred (i) in dismissing the Plaintiffs' Complaint with prejudice and, alternatively, (ii) in denying leave to file an amended pleading.

2. Whether the Plaintiffs have a viable claim for relief under the Fourth Amendment against Defendants under 42 U.S.C. § 1983, as pled in the First Cause of Action. (CR #1, ER000063)

3. Whether Plaintiffs have a viable claim for relief under the Equal Protection Clause of the Fourteenth Amendment against Defendants under 42 U.S.C. § 1983, as pled in the Second Cause of Action. (CR #1, ER000064)

4. Whether the Plaintiffs have viable state law claims for Malicious Prosecution and Abuse of Process, as pled in the Third and Fourth Causes of Action. (CR #1, ER000065 & ER000066)

5. Whether the Plaintiffs have a viable claim under the First and Fourteenth Amendments against Defendants under 42 U.S.C. § 1983.

6. Whether the Plaintiffs have a viable claim for relief under the Privileges and Immunities Clause of the Fourteenth Amendment against Defendants under 42 U.S.C. § 1983.

7. Whether this Court should order, for remand, assessment of 42 U.S.C. § 1988 interim litigation expenses and counsel fees for Appellants prior to trial on the

merits of the remaining factual and legal questions.

## IV.   <u>STATEMENT OF THE CASE.</u>

This case comes before this Court as an appeal from a final Order of Dismissal with Prejudice granting the Defendants' motion to dismiss for failure to state a claim and lack of standing, and a denial of leave to amend.  (CR #42, ER00005)  The Plaintiffs filed a Class Action Complaint for Damages and Injunctive Relief (CR #1, ER 000059) on September 27, 2011, and set forth four causes of action against the Defendants, all predicated on (i) the Defendants' failure to train their officers and agents on any aspect of Nevada's Helmet Law, NRS §486.231and (ii) the Defendants' formal and informal policies of arbitrary and discriminatory enforcement.

The Plaintiffs contend that Defendants have failed to instruct, train or equip their officers and agents in the "particulars of the Nevada Helmet Law or the constitutionally sufficient probable cause necessary to issue a Helmet Ticket under the Nevada Helmet Law." (CR #1, ER000063)

The Plaintiffs generally contend that the Defendants engage in an ongoing pattern and practice of arbitrary and discriminatory enforcement of NRS §486.231, based on "constitutionally deficient probable cause." (CR #1, ER000064)

///

The Plaintiffs further allege that because the Defendants issue "Helmet Tickets" with deficient probable cause, they engage in acts that are illegal rather than discretionary in nature and thus are not entitled to qualified immunity under NRS 41.031(1). (CR #1, ER000063)

Based upon these general allegations, the Plaintiffs allege for their First Cause of Action that the Defendants have violated the Plaintiffs' Fourth Amendment protections against unreasonable searches and seizures. (CR #1, ER000063)

For their Second Cause of Action, the Plaintiffs allege violations of the Fourteenth Amendment protections against arbitrary and discriminatory enforcement of Nevada's Helmet Law. (CR #1, ER000064)

For their Third Cause of Action, the Plaintiffs allege a claim for Malicious Prosecution occasioned by the Defendants' pattern and practice of instituting criminal actions against Plaintiff Class Members and then routinely dismissing the prosecutions when challenged in a court of law. (CR #1, ER000065)

Finally, for their Fourth Cause of Action, the Plaintiffs allege Abuse of Process arising from the Defendants alleged practice of engaging in arbitrary and discriminatory enforcement of the Nevada Helmet Law as a pretext for invading the liberties and civil rights of the Plaintiff Class Members. (CR #1, ER000066)

///

In their Motions to Dismiss, (CR #s 11, 16 and 17), all of which were joined by one another, the Defendants argued that the Plaintiffs' Complaint is void of factual allegations of specific conduct by particular Defendants, but is instead a conglomeration of generalized allegations of legal violations," without specific allegations of a single event, on any identified date, in any jurisdiction, by any named Defendant.

The District Court accepted the Defendants arguments at face value, and issued an order dismissing the Plaintiffs' Complaint for failing "... to state claims for relief that are plausible on their face showing Plaintiffs are entitled to relief as required under Rule 8(a)(2) of the Federal Rules of Civil Procedure. Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007) and Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009)." (CR #42, ER00006:20)

In dismissing the Plaintiffs' case, the District Court essentially stated the Complaint was too vague and concluded "... that further attempt at amendment would be futile." (CR #42, ER00007:12)

Pursuant to F.R.A.P. Rule 4(a)(1)(A), the Plaintiffs timely filed a notice of appeal on March 19, 2012. (CR #46, ER00001)  Plaintiffs respectfully request that this Court (i) decide this case as a matter law, or in the alternative, (ii) remand the matter to the District Court for the filing of Answers by the Defendants or (iii) the filing of an Amended Complaint.

## V.    STATEMENT OF THE FACTS.

### A. Applicable Statutes and Administrative Codes.

Nevada's Helmet Law was adopted in 1971; it has remained fundamentally unchanged since then.

**1.  The Statute -** NRS 486.231, in its current form provides, in pertinent parts**:**

> 1.  The Department shall adopt standards for protective headgear and protective glasses, goggles or face shields to be worn by the drivers and passengers of motorcycles and transparent windscreens for motorcycles.
>
> 2.  Except as provided in this section, when any motorcycle, except a trimobile or moped, is being driven on a highway, the driver and passenger shall wear protective headgear securely fastened on the head and protective glasses, goggles or face shields meeting those standards.

2.  **The DPS Code** – On March 30, 1994, more than 20 years after Nevada adopted its Helmet Law, Nevada Department of Motor Vehicles & Public Safety ("DPS") complied with NRS §486.231(1) when it adopted NAC 486.015, the which provides, in pertinent part:

> The department hereby adopts by reference the regulations contained in 49 C.F.R. § 571.218, *as those regulations existed on January 1, 1994*. (emphasis added)

3.  **The CFR Standard** – By way of 49 C.F.R. §571.218, the National Highway Transportation and Safety Administration ("NHTSA") set forth the performance standards for protective headgear (the "CFR Standard") and the testing protocols to be administered by the U.S. Department of Transportation

5

("DOT Certification").

   **a.    Scope of the CFR Standard** - By way of Title 49, United States Code Chapter 301 Motor Vehicle Safety (the "FMVSS"), Section 30112, "a person may not manufacture for sale, sell, offer for sale, introduce or deliver of introduction in interstate commerce … any motor vehicle equipment … unless the equipment complies with the [Standard]." (CR 46, ER) On its face, the Standard does not apply to non-manufacturers and end-users.

   **b. Preemption** - By way of the FMVSS, Section 30103(b), a State is "expressly preempted from having a standard applicable to the same aspect of performance as the FMVSS **unless the State standard is identical to the Federal requirement**."

   **c. Compliance with the CFR Standard** – NHTSA "does not maintain a list" of compliant motorcycle helmets. Instead, the CFR Standard establishes a "self-certification" process under which "each manufacturer is responsible for certifying that its products meet all applicable safety standards." All helmets manufactured and distributed under the "self-certification" process are deemed to be in compliance until a specific helmet is tested and fails the test.

   *///*

6

**d. Elements of the CFR Standard** – DOT Certification requires **tested** helmets to pass certain tests in order to be found in compliance with the CFR Standard. Those tests include (i) impact, (ii) penetration, (iii) retention, (iv) configuration, (v) peripheral vision/brow opening and (vi) labeling. The CFR Standard does not prescribe the size, weight, color or amount of the head which must be covered by the helmet.

**e. Testing** – Testing is performed by private laboratories under contract with NHTSA. During the period of 2000 through 2008, NHTSA published testing results which showed that over the 9-year period, 356 helmets were tested, with an overall pass rated of 56%.

Because helmets are not required to be tested before being sold, every one of the helmets that failed the testing represented a specific model that had already been manufactured and already been placed into the stream of commerce. The only certainty regarding the compliance of any piece of protective headgear is that a helmet is non-compliant ***if and only if*** (i) it has been tested and (ii) it failed the test.

**f.     The NHTSA Tri-Fold** – In 2004, NHTSA produced a tri-fold flyer (the "NHTSA Tri-fold"), entitled "How to Identify Unsafe Motorcycle Helmets." The NHTSA Tri-Fold's stated purpose is to show "how to distinguish unsafe helmet from those that meet the Federal safety standard"

and uses words such as "most," "in some cases," "sometimes," "normally," "generally," "may be a clue," "some," "for example" and "indicators."

The NHTSA Tri-Fold does not state that it has been officially adopted as the CFR Standard or that its contents have the force of law. As such, the NHTSA Tri-Fold is neither definitive nor authoritative.

*From the above, it is without question that the only standard which the State of Nevada can enforce is the CFR Standard.*

**B. Factual Allegations.**

The Plaintiffs alleged that the Defendants have a pattern and practice of arbitrary and discriminatory enforcement of Nevada's Helmet Law and the CFR Standard. By way of their Oppositions to the Defendants' Motions to Dismiss, the Plaintiffs provided nine affidavits setting forth the factual bases of the allegations of the Defendants' arbitrary and discriminatory enforcement:

1. Affidavit of James B. Canfield (CR #18-2, ER000083)
2. Affidavit of Karen Jurasinski (CR #18-3, ER000086)
3. Affidavit of David R. Stilwell (CR #18-4, ER000089)
4. Affidavit of Mike "Bones" Davis (CR #18-6, ER000092)
5. Affidavit of David R. Stilwell re Metro Officer Jackson (CR #18-7, ER000096)
6. Affidavit of David R. Stilwell re Boulder City (CR #18-10, ER000098)
7. Affidavit of Lillian "Tiger Lily" Gonzalez (CR #25-1, ER000099)

8.    Affidavit of David R. Stilwell re City of North Las Vegas (CR #125-2, ER000102)

9.    Affidavit of Carlos Augustine Bolton (CR #25-2, ER000106).

By way of the nine affidavits, including numerous Exhibits, the Plaintiffs supported their allegations against each of the Defendants for the arbitrary and discriminatory enforcement of Nevada's Helmet Law, including proof of the lack of training in the CFR Standard, proof of profiling and enforcement practices that violate the rights of the Plaintiffs and all Class Members. For purposes of providing the factual bases for amending the Complaint, the District Court disregarded the value of the facts alleged in the nine affidavits and stated in its Order that it "cannot consider with respect to Defendants' pending motions to dismiss pursuant to Rule 12(b)(6) of the Rules of Federal Procedure, do [sic] not cure the deficiencies in Plaintiffs' Complaint." (CR #42, ER00007:7)

## VI.    **SUMMARY OF THE ARGUMENT.**

The one fact central to the Plaintiffs' Complaint is that the Defendants ***do not, and never have,*** trained their law enforcement officers or prosecutors in any of the elements or standards embodied in the CFR Standard. This fact deprives the Defendants' officers and prosecutors of any claim of probable cause to cite or prosecute, or any claim of immunity for doing so.

Thus, without probable cause, any search and seizure, citation or arrest, prosecution and conviction of the Plaintiffs by the Defendants is a wholesale violation of the constitutional protections as set forth below.

## VII.   STANDARD OF REVIEW.

This Court reviews *de novo* a grant of a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6).  Stone v. Travelers Corp., 58 F.3d 434, 436-37 (9th Cir. 1995). "[A] complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the Appellant can prove no set of facts in support of his claim which would entitle him to relief." Hughes v. Rows, 449 U.S. 5, 10 (1980) (citation omitted).  When reviewing a district court's dismissal of a complaint for failure to state a claim, this Court must accept the facts alleged in the complaint as true. Hartford Fire Ins. Co. v. California, 509 U.S. 764, 770 (1993).

The Court must assume that all general allegations and "embrace whatever specific facts might be necessary to support them." Peloza v. Capistrano Unified School Dist., 37 F.3d 517, 521 (9th Cir. 1994).

"[A] district court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts." Doe v. United States, 58 F.3d 494, 497 (9th Cir. 1995).  This amendment policy

is informed by Federal Rule of Civil Procedure 15(a), which provides that leave to amend should be freely granted "when justice so requires."

Since the state's helmet laws and government policies burden fundamental rights, the statute and policy receives heightened scrutiny under the Fourteenth Amendment's Equal Protection Clause. Silveria v. Lockyer, 312 F.3d 1052, 1087-8 (9th Cir. 2002).

Errors in the District Court are presumed prejudicial. Obrey v. Johnson (Obrey I), 400 F.3d 691, 699 –701 (9th Cir.2005) (affirming and readopting harmless error standard stated in Haddad v. Lockheed Calif. Corp., 720 F2d 1454, 1459 (9th Cir. 1983) and abrogating inconsistent standard "inadvertently" stated in Kisor v. Johns–Manville Corp., 783 F2d 1337, 1340 (9th Cir. 1986); Dang v. Cross, 422 F3d 800, 811 (9th Cir. 2005).

Additionally, under NRS §176.115, prosecution maliciously or without probable cause entitles the Plaintiffs to recover their "costs of the action" from the Defendants.

## VIII.  ARGUMENT.

### A. The District Court erred (a) in dismissing the Plaintiffs' Complaint with prejudice and (b) denying leave to file an amended pleading.

#### 1.  Order of Dismissal with Prejudice.

In ruling on a motion to dismiss, the District Court is required to "accept

the facts alleged in the complaint as true." <u>Hartford Fire Ins. Co. v. California</u>, 509 U.S. 764, 770 (1993). Here, the District Court ignored the allegation that the Defendants have never trained their officers and agents on the CFR Standard. The consequences of this failure to train are a pernicious pattern and practice by the Defendants of arbitrary and discriminatory enforcement of the CFR Standard, as alleged in the Plaintiffs' Complaint. Under *Obrey*, The District Court's error on this point is presumed to be prejudicial.

As required under <u>Peloza</u>, the District Court failed to draw all reasonable inferences in a light favorable to the Plaintiffs; namely, that the lack of training in the CFR Standard (U.S. DOT, Federal Motor Safety Standard § 571.218, *et. seq.*) deprived the Defendants' officers and prosecutors of probable cause to cite and prosecute. And the District Court failed to include the factual allegations raised by the Plaintiffs' Oppositions in its analysis of the Plaintiffs' claims for purposes of curing any defects in the Complaint.

## 2.     Denial of Leave to Amend.

Prior to the hearing on the Motions to Dismiss, the Plaintiffs had offered the District Court a proposed Amended Complaint that incorporated the factual allegations raised in their Oppositions and the nine affidavits. In addition, during oral argument the District Court confirmed the Plaintiffs' request that, should an

amended complaint be permitted, that the Plaintiffs would be allowed to expand the factual allegations beyond those contained in the proposed Amended Complaint. (CR #54, ER000030:19).

Contrary to <u>Doe v. U.S.</u> and FRCP 15(a), the District Court erred in denying the Plaintiffs the opportunity to cure any defects by way "additional facts" in an amended Complaint.

### B. The Plaintiffs have a viable claim for relief under the Fourth Amendment against Defendants under 42 U.S.C. § 1983, as pled in the First Cause of Action.

The Defendants' policy and practices of enforcement are violative of the Fourth Amendment's protections against unreasonable search and seizure. Moreover, the challenged state statute and administrative code granting absolute and unbridled discretion to law enforcement run afoul of the Fourth Amendment to the United States Constitution and the Nevada Constitution.

As set forth by the U.S. Supreme Court in <u>Grayned v. City of Rockford</u>, 408 U.S. 104, 108, 92 S.Ct. 2294 (1972), "if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. A vague law impermissibly delegates basic policy matters to policemen, judges and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and

discriminatory application."

The purpose of the Fourth Amendment is …"'to prevent arbitrary and oppressive interference by enforcement officials with the privacy and personal security of individuals.' United States v. Martinez-Fuerte, 428 U.S. 543, 554, 96 S.Ct. 3074, 3081, 49 L.Ed.2d 1116.  As long as the person to whom questions are put remains free to disregard the questions and walk away, there has been no intrusion upon that person's liberty or privacy as would under the Constitution require some particularized and objective justification."  United States v. Mendenhall, 446 U.S. 544, 554, 100 S.Ct. 1870, 1877 (1980).  Here, the absolute lack of probable cause to cite and prosecute the Plaintiffs provides no "objective justification" for the "arbitrary and oppressive interference by enforcement officials with the privacy and personal security of individuals." United States v. Martinez-Fuerte, 428 U.S. 543, 554, 96 S.Ct. 3074, 3081, 49 L.Ed.2d 1116.

Similarly, by way of Gallegos v. State, 163 P.3d 456, 460 (2007) (citing Silvar v. Dist. Ct., 122 Nev. 289, 292, 129 P.3d 682 (2006), the Nevada Supreme Court has affirmed that a criminal statute is subject to a facial attack if it "lacks specific standards, thereby encouraging, authorizing, or even failing to prevent arbitrary and discriminatory

enforcement." The Court's concern was that "absent adequate guidelines," the statute in question would allow police to "pursue their personal predilections." Gallegos, 163 P.3d at 461 (quoting Kolender v. Lawson, 461 U.S. 352, 358, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1983)).

Here, the exact fears of the U.S. and Nevada Supreme Courts are manifested where the Defendants (i) have failed to train their officers and agents in the CFR Standard and (ii) have permitted and encouraged citizens to be cited and prosecuted based upon the subjective ignorance of its officers and prosecutors.

Furthermore, the challenged state statute and administrative code are void for vagueness and should be struck down as unconstitutional on their face before an answer is even filed, similar to how the California's weapon ban was declared unconstitutional at the pleading stage in Silveira v. Lockyer, 312 F.3d 1052, 1090 (9th Cir.) (Reinhardt, J), rehearing en banc denied, 328 F.3d 567 (9th Cir. 2003) (six dissents), where the 9th Circuit struck down a California law before an answer was filed, with a procedural history identical to this case (i.e. dismissal of the complaint on a motion to dismiss without leave to amend).

/ / /

/ / /

**C. The Plaintiffs have a viable claim for relief under the Equal Protection Clause of the Fourteenth Amendment against Defendants under 42 U.S.C. § 1983, as pled in the Second Cause of Action.**

The Equal Protection Clause prohibits states from treating similarly situated people in a dissimilar manner. <u>City of Cleburne v. Cleburne Living Center Inc.</u>, 473 U.S. 432 (1985). In <u>Village of Willowbrook v. Olech</u>, (2000) 120 S.Ct. 1073, 145 L.Ed.2d 1060, the U.S. Supreme Court unanimously held that denial of Equal Protection may occur in a "class of one" situation if there is no rational basis for intentionally different treatment which results in arbitrariness and capriciousness.

Even under the decision of <u>Guillory v. County of Orange</u>, 731 F.2d 1379 (9th Cir. 1984), wherein this Circuit previously held that even if there was no liberty or property right, a law that is administered arbitrarily so as to unjustly discriminate between similarly situated people may deny equal protection. <u>Guillory v. County of Orange</u>, 731 F.2d 1379, 1383 (9th Cir. 1984); <u>Wedges/Ledges of California, Inc. v. City of Phoenix</u>, 24 F.3d 56, 67 (9th Cir.1994).

To sustain their burden, Plaintiffs need only plead sufficient facts that others similarly situated generally have not been treated in a like manner, or that enforcement targets a fundamental right. See <u>Kuzinich v.</u>

16

County of Santa Clara, 689 F.2d 1345, 1349 (9th Cir.1983).

Here, the Plaintiffs allege, and have demonstrated the factual bases for doing so, that the Defendants "engage in arbitrary and discriminatory enforcement of the Nevada Helmet Law as a pretext for invading the liberties and civil rights of the Class Members, with no demonstrated concern for the safety or civil rights of the Class Members." (CR #1, ER000066)

### 1. Disparate Treatment.

It is an open secret that law enforcement in Southern Nevada views certain motorcyclists as outlaw gang members, merely based upon their equipment, clothing and their associations. Those motorcyclists with conservative riding gear and appearance are rarely pulled over on any rationale other than a moving traffic violation. But motorcyclists with leathers, patches and chopper-looking motorcycles are routinely pulled over and subjected to intrusive searches, often resulting in just the issuance of helmet ticket as a form of discriminatory retaliation and abuse of police power. These pretextual stops are an overt form of disparate treatment and punishing individuals for expressing themselves.

Hence, forcing someone to wear a particular type of clothing, or punishing those who don't, offends the First Amendment and Equal

Protection guarantees of the Fourteenth Amendment.

In comparison, automobile tires are subject to the same regulations under the CFR Standard as motorcycle helmets, and for even greater reasons of public safety. An automobile tire failure is more likely to injure an innocent third party that a non-compliant motorcycle helmet (Plaintiffs are unaware of an automobile operator who was killed by a motorcyclist). And yet there has likely never been a reported incident where the Defendants have cited a motorist for his tires failing to meet the CFR Standards because the Defendants do not, and never have, trained their officers in those CFR Standards. Thus, the Plaintiffs are members of a class that is subject to disparate treatment and purely pretextual arrest with no rational basis.

### 2.  Liberty Interest.

It should be noted that James Madison, no minor authority on the constitutional text, noted the importance of not limiting rights of people to specific constitutional text.  In doing so, in Federalist 37, he observed, "no language is so copious as to supply words and phrases for every complex idea, or so correct as not to include many equivocally different ideas." THE FEDERALIST NO. 37, at 197 (Clinton Rossiter, ed., 1961).

In Planned Parenthood V. Casey, 505 U.S. 833, (1992),  Supreme

Court declares that by the express provisions of the "first eight amendments" to the Constitution rights were "guaranteed to the individual," "which the government may not enter."

The Court also adopted the Harlan dissent in <u>Poe V. Ullman</u>, 367 U.S. 497, 541 that: ". . . 'liberty' is not a series of isolated points . . . in terms of the taking of property; the freedom of speech, press and religion; the right to keep and bear arms; the freedom from unreasonable searches and seizures . . . It is a rational continuum which . . . *includes a freedom from all arbitrary impositions* . . . " [emphasis added]

The Supreme Court has held that: "In many cases . . . this Court has looked to the fundamental nature of original Bill of Rights guarantees to decide whether the Fourteenth Amendment makes them obligatory on the States" (<u>Gideon V. Wainwright</u>, 372 U.S. 335 (1963)) and that: "All fundamental rights comprised within the *term liberty* are protected by the federal Constitution from invasion by the states." [emphasis added]

Hence, forcing someone to wear a particular type of clothing, or punishing those who don't, offends the liberty guarantees of the Fourteenth Amendment.

For better or for worse, the Plaintiffs recognize that we live in a world of nation-states in which our government must be able to function

19

effectively.  However, that is not to say that the states are free to impose arbitrary restrictions on a small minority of travelers under the guise of public safety.

The government proffers the unsupported rational for intrusion on the Plaintiffs' individual liberties that a piece of plastic on the head saves lives.  First, 53,000 people are killed in motor vehicle accidents. "NHTSA *estimates* that helmets saved 1,829 motorcyclists' lives in 2008, and that 870 more could have been saved if all motorcyclists had worn helmets." See http://www-nrd.nhtsa.dot.gov/pubs/811159.pdf   The same government agency also states that as recently as 2008, there were over 7 million motorcycles registered in the United States.  From a pure statistical standpoint, that means if every motorcycle rider in the United States wore a helmet, there would only be a .02% increase in the number of lives saved.

However, (i) 43% of rider fatalities had a blood alcohol level of .08%, (ii) 25% did not have a motorcycle license, which can be equated with inexperience and (iii) 35% had been speeding.  If alcohol, inexperience, and speeding are eliminated from NHTSA's own records, what becomes glaringly obvious is that a reasonably prudent experienced motorcycle rider is less like likely die in an accident as compared to a

person in a passenger vehicle.

Assuming arguendo, without conceding the point, that somehow a piece of plastic on the head is going to save a motorcycle rider's life in 110 degree temperatures in the Nevada desert at critical impact highway speeds, then all motor vehicle operators should be forced to wear a piece of plastic on their head as well. Is this Court prepared to allow that to happen – Nevada passing a law requiring all travelers to the state to wear "protective headgear?"

In sum, (i) the nominal safety a helmet provides at extremely low speeds, such as falling over in a parking lot and (ii) the non-existence of any benefit at critical impact speeds (i.e. speeds of 60-75 mph), as compared to the burden it places on an individual's liberty, physical well-being (e.g. neck injury, heat exhaustion, and ear damage), and freedom of expression, places too much of a burden on upon the Plaintiffs liberty interests and is simply a tool for arbitrary and discriminatory enforcement.

Here, the District Court erred in dismissing the Complaint which clearly stated sufficient facts to support a viable action under the Equal Protection Clause of the Fourteenth Amendment, which protects individuals from unjustifiable disparate treatment.

///

21

**D. The Plaintiffs have viable state law claims for Malicious Prosecution and Abuse of Process, as pled in the Third and Fourth Causes of Action.**

The Defendants' officers and prosecutors are completely ignorant

of the relevant CFR Standard and, therefore, cannot have probable cause.

Thus, the citations issued and the prosecutions satisfy the elements of the

Plaintiffs' state law claims for Malicious Prosecution and Abuse of

Process.

Here, the District Court erred in dismissing the Complaint which

clearly stated sufficient facts to support a viable action under state law

claims for Malicious Prosecution and Abuse of Process.

**E. The Plaintiffs have a viable claim for relief under the First Amendment, incorporated through the Fourteenth Amendment, against Defendants under 42 U.S.C. § 1983.**

The First and Fourteenth Amendments protect the rights of

individuals to express themselves, without state-decreed monopolization

of speech and expression.

It is an open secret that law enforcement in Southern Nevada views

certain motorcyclists as outlaw gang members, merely based upon the

expressions embodied in the choices their equipment, their clothing and

their associations. Those motorcyclists with conservative riding gear and

appearance are rarely pulled over on any rationale other than a moving

22

traffic violation. But motorcyclists with leathers, patches, chopper-looking motorcycles are routinely pulled over and subjected to intrusive searches, often resulting in the arbitrary and discriminatory issuance of helmet ticket as a form of punishment and abuse of police discretion.

The effect of the Defendants' arbitrary and discriminatory enforcement is to chill the right to self-expression of certain motorcyclists merely on the basis of their equipment, their clothing and their associations. Discovery conducted on this point will lead to conclusive evidence of bias-based policing and constitutional violations.

Here, the District Court erred in dismissing the Complaint which clearly stated sufficient facts to support a viable action under the First Amendment, which embodies a fundamental right to free speech and expression.

**F. The Plaintiffs have a viable claim for relief under the Privileges and Immunities clause of the Fourteenth Amendment, against Defendants under 42 U.S.C. § 1983.**

**1. The Defendants' arbitrary and discriminatory enforcement of Nevada's Helmet Law and the CFR Standard unjustifiably violates the Plaintiffs' right to travel under the Privileges and Immunities Clause.**

The Supreme Court has recognized a fundamental right to interstate travel. Attorney General of New York v. Soto-Lopez, 476 U.S. 898, 903, 106 S.Ct. 2317, 90 L.Ed.2d 899 (1986) (Brennan, J., plurality

opinion). However, burdens placed on travel generally, such as gasoline taxes, or minor burdens impacting interstate travel, such as toll roads, do not constitute a violation of that right. *See* Kansas v. United States, 16 F.3d 436, 442 (D.C.Cir.1994).

Furthermore, though this Court has held that burdens on a single mode of transportation do not implicate the right to interstate travel (*See* Monarch Travel Servs., Inc. v. Associated Cultural Clubs, Inc., 466 F.2d 552, 554 (9th Cir.1972), an individual cannot be punished for utilizing a particular method of travel. Similarly, an individual should not be forced to wear a particular type of clothing.

Section 1 of the Fourteenth Amendment provides in pertinent part:

**No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States**;

Senator Howard, who introduced the Fourteenth Amendment for passage in the Senate, stated:

> Such is the character of the privileges and immunities spoken of in the second section of the fourth article of the Constitution [the Senator had just read from the old opinion of Corfield v. Coryell, 6 Fed. Cas. 546 (No. 3,230) (E. D. Pa. 1825), also cited in n14 of Saenz v. Roe, 526 U.S. 489]. To these privileges and immunities, whatever they may be - for they are not and cannot be fully defined in their entire extent and precise nature - to these should be added the personal rights guaranteed and secured by the first eight amendments of the Constitution; such as the freedom of speech and of the press; the right of the people peaceably to assemble and petition the Government for a redress of grievances, a right appertaining to each and all the people;

the right to keep and to bear arms; the right to be exempted from the quartering of soldiers in a house without the consent of the owner; the right to be exempt from unreasonable searches and seizures, and from any search or seizure except by virtue of a warrant issued upon a formal oath or affidavit; the right of an accused person to be informed of the nature of the accusation against him, and his right to be tried by an impartial jury of the vicinage; and also the right to be secure against excessive bail and against cruel and unusual punishments.

Now, sir, here is a mass of privileges, immunities, and rights, some of them secured by the second section of the fourth article of the Constitution, which I have recited, some by the first eight amendments of the Constitution; and it is a fact well worthy of attention that the course of decision of our courts and the present settled doctrine is, that all these immunities, privileges, rights, thus guaranteed by the Constitution or recognized by it, are secured to the citizens solely as a citizen of the United States and as a party in their courts. They do not operate in the slightest degree as a restraint or prohibition upon State legislation. . . .

. . . The great object of the first section of this amendment is, therefore, to restrain the power of the States and compel them at all times to respect these great fundamental guarantees. Cong. Globe, 39th Cong., 1st Sess., 2765-2766 (1866).

The problem lies in treating the terms "right", "interest",

"immunities, and "privileges" as separate and distinct terms of art.

However, this has not been the case throughout a long history in English

law, in which originally all "rights" were considered "privileges" granted

by the sovereign, that is, the monarch.  But with independence of the

American colonies, making the people the sovereign, and their adoption of

the Constitution, came recognition in law that the rights recognized and

protected in the Constitution precede the Constitution, and are either

natural, preceding society and government, or arise out of the social contract that created the society, and are therefore not "granted" by the Constitution, but only recognized and protected by it, and would exist even if the Constitution did not.  See District of Columbia v. Heller, 554 U.S. 570 (2008).   The Bill of Rights "implicitly recognizes the pre-existence" of rights and codified some of those rights, but not all of them. Rights are not granted by the Constitution. Neither are rights in any manner dependent upon that instrument for their existence.

A right may only be disabled, or restricted, by due process, on an individual case to case basis, either in punishment for a crime, or upon proof beyond a reasonable doubt to a unanimous jury of twelve that, if not disabled, the person would cause harm to himself or others.  See Board of Regents v. Roth, 408 U.S. 564, 569, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); Dittman v. California, 191 F.3d 1020, 1029 (9th Cir.1999); Wedges/Ledges of Cal., Inc. v. City of Phoenix, 24 F.3d 56, 62 (9th Cir.1994); Gallo v. U.S. Dist. Court For Dist. of Arizona, 349 F.3d 1169, 1178 (9th Cir.2003).

As for the regulation of a privilege, one can find no basis in original understanding of the Constitution that even the federal government, under the commerce clause, has the authority to make it a

privilege to travel inter or intrastate, or to engage in commerce. The power to regulate travel is dependent upon the power to impose legislative restrictions on the modality of travel and movement between the states with regard to commerce, and not on the persons who might engage in such trade, which is precisely what is happening to motorcyclists.

The Supreme Court has also held that given their contemporaneous proposal and passage, the amendments of the Bill of Rights should be read in p*ari materia*, and amendments which contain similar language should be construed similarly. Patton v. United States, 281 U.S. 276, 298 (1930).

As Professor Ronald Dworkin has argued, what it means to take rights seriously is that one will honor them even when there is significant social cost in doing so. Protecting freedom of speech, the rights of criminal defendants, or any other part of the Bill of Rights has significant costs - criminals going free, oppressed groups having to hear viciously racist speech and so on - consequences which we take for granted in defending the Bill of Rights. This mind-set changes, however, when the right to travel is concerned. "Cost-benefit" and "public safety" analysis is the mantra of the government and is the weapon of choice to attack rights. Yet the tables are strikingly turned when pornography, video games, violent movies, medical marijuana, witchcraft, smoking, alcohol, and the

27

number one killer in America, prescription medication, are the subject of prescriptive regulation. (Lisa Girion, Scott Glover and Doug Smith, <u>Drug Deaths Now Outnumber Traffic Fatalities In U.S., Data Show</u> Los Angeles Times, September 17, 2011: "Propelled by an increase in prescription narcotic overdoses, drug deaths now outnumber traffic fatalities in the United States, a Times analysis of government data has found. Drugs exceeded motor vehicle accidents as a cause of death in 2009, killing at least 37,485 people nationwide, according to preliminary data from the U.S. Centers for Disease Control and Prevention.")

Justice Scalia has argued that the "Founders were right when they feared that some future generation might wish to abandon liberties that they considered essential, and so sought to protect those liberties in a Bill of Rights. We may tolerate the abridgement of property rights and the elimination of a right to bear arms; but we should not pretend that these are not reductions of rights." Antonin Scalia, <u>Common-Law Courts in a Civil-Law System: The Role of United States Federal Courts in Interpreting the Constitution and Laws, in A Matter of Interpretation: Federal Courts and the Law</u> 3, 43 (Amy Gutmann, ed.1997).

The Ninth Circuit acknowledged in <u>Silveria</u> that: "<u>Fresno Rifle</u> itself relied on <u>United States v. Cruikshank</u>, 92 U.S. 542, 23 L. Ed. 588

(1876), and <u>Presser v. Illinois</u>, 116 U.S. 252, 29 L. Ed. 615, 6 S. Ct. 580 (1886), decided before the Supreme Court held that the Bill of Rights is incorporated by the Fourteenth Amendment's Due Process Clause. Following the now-rejected <u>Barron v. Baltimore</u>, 32 U.S. (7 Pet.) 243, 8 L. Ed. 672 (1833) (holding that the Bill of Rights did not apply to the states), <u>Cruikshank</u> and <u>Presser</u> found that the Second Amendment restricted the activities of the federal government, but not those of the states. One point about which we are in agreement with the Fifth Circuit is that <u>Cruikshank</u> and <u>Presser</u> rest on a principle that is now thoroughly discredited."

Pockets of bias against motorcyclists are not unlike the all too frequent prejudice toward persons of color, women and sometimes men as a class, quirky religions, access to birth control, homosexual persons, and the next prejudice *de jour*. Broad bias typically persists because of misinformation and insufficient thoughtful study. The Bill of Rights is the citizens' protection from such bias. See Sandra Day O'Connor, The Majesty of the Law 59 (N.Y.: Random House 2003).

In <u>Brown v. Board of Ed.</u>, 347 U.S. 483 (1954), the United States Supreme Court took pains to be unanimous and to overrule <u>Plessy v. Ferguson</u>, 163 U.S. 537 (1896) after many hours of argument and re-

29

argument. The Court struggled with the issues leading up to *Brown* for what today seems to have been a very long time. See Del Dickson ed., The Supreme Court in Conference 635-671 (1940-1985)(N.Y.: Oxford 2001).

Bradwell v. The State, 83 U.S. 130 (1873), is now seen as a curiosity of condescending patriarchy.  It follows the Slaughter-House Cases, 83 U.S. 36 (1873), which have been roundly criticized. Categorical discrimination against women was not remedied by the Fourteenth Amendment. The government endorsed the irrational bias of sex discrimination even in the very hour when it was abolishing slavery and empowering freed-men-only to vote.  Millions of qualified women were thus denied the right to vote from 1868 to 1920.

The Supreme Court allowed Reconstruction to fail and abandoned the Freedmen to an unkind fate. The Supreme Court, from 1873 into the nineteenth century, perpetuated the same errors, often over the lone dissent of Justice Harlan, and sometimes Justice Field.  The progression of decisions following the narrow Slaughter-House Cases mode included Presser v. Illinois, 116 U.S. 252 (1886) (Woods, J), which held that the First and Second Amendments did not inhibit state action infringing the rights to assemble and to keep and bear arms without a discretionary

permit from the Governor. <u>Presser</u> may remain on the books, but it underlying legal basis has thoroughly been discredited.

The right to travel should further be considered a Privilege or Immunity protected by the Fourteenth Amendment. The right is expressed throughout the history of the Fourteenth Amendment. It is of stature similar to the right to travel upheld in <u>Saenz v. Roe</u>, 526 U.S. 489 (1999), and earlier in <u>Doe v. Bolton</u>, 410 U.S. 179 (1973). See also <u>Mapp v. Ohio</u>, 367 U.S. 643, 655 (1961).

<u>Saenz v. Roe</u>, 526 U.S. 489 (1999) (Stevens, J), is important here as a step toward recognizing the intended original strength of the privileges or immunities clause. The <u>Saenz</u> majority followed <u>U.S. v. Guest</u>, 383 U.S. 745 (1966), in recognizing the right to travel as protected by that neglected clause of the Fourteenth Amendment. <u>Saenz</u> recalled that "Justice Stewart reminded us in <u>Shapiro v. Thompson</u>, 394 U.S. 618, 643 (1969), [that] the right is so important that it is 'assertable against private interference as well as governmental action ... a virtually unconditional personal right, guaranteed by the Constitution ….'" (concurring opinion).

Because the right to travel is so important, the present case presents for this Court a rare opportunity after 130 years to ignore the

31

wrongful legacy of the <u>Slaughter-House Cases</u> and <u>Cruikshank</u> and its progeny.

Though the <u>Mapp</u> Court applied the Due Process Clause, the Supreme Court has always held that "the full scope of the liberty guaranteed by the Due Process Clause . . . is not a series of isolated points. . . . It is a rational continuum which, broadly speaking, includes a freedom from all substantial arbitrary impositions and purposeless restraints. . . ." <u>Poe v. Ullman</u>, 367 U.S. 497, 543 (1961) (dissenting opinion); <u>Moore v. East Cleveland</u>, 431 U.S. 494, 501-2 (1977); <u>Roe v. Wade</u>, 410 U.S. 113, 169 (1973).

At least three generations of law students and constitutional lawyers have understood that the <u>Slaughter-House Cases</u>, 83 U.S. 36 (1873) (5-4), and <u>United States v. Cruikshank</u>, 92 U.S. 542 (1876), were not well considered. Many of the Justices of that era chose to disregard the historical circumstances, legislative debates, and plain purposes of the Fourteenth Amendment and related legislation. Justice Black has leveled that specific criticism against them:  "[P]revious decisions of this Court … however, had not appraised the historical evidence on that subject." <u>Adamson v. California</u>, 332 U.S. 46, 74 (1947) (separate opinion).

It is no coincidence that the <u>Slaughter-House Cases</u> in the U.S.

Reports is followed immediately by <u>Bradwell v. The State</u>, 83 U.S. 130 (1873), another legacy of the judicial disregard for the Fourteenth Amendment and individual rights. Adherence to the <u>Slaughter-House Cases</u> and <u>Cruikshank</u> can only provoke continued solid criticism and frustration with the system of justice. The evidence of past error is too strong and widely known.

Justice Noah Swayne observed in the <u>Slaughter-House Cases</u> that the majority turned "what was meant for bread into a stone." 83 U.S. at 129.  One need not be a constitutional scholar to shudder at the reasoning and brutal reality of the <u>Slaughter-House Cases</u> and <u>Cruikshank</u> as they attempted to gut the Fourteenth Amendment, leaving next to no protection for the lives and liberty of Freedmen, Freedwomen, and supporters of their cause.

<u>Cruikshank</u> did so following the murderous "Colfax massacre" of Freedmen in Louisiana.  Federal prosecutors charged Klansmen with conspiracy to prevent blacks from exercising civil rights, including the rights to vote and to bear arms for community defense. The <u>Cruikshank</u> Court freed the Klansmen to ride again and again, with no reference to the massacre, without any mention of the refusal of Louisiana to enforce its laws, or the complicity of state and local officials in the massacre.

The <u>Slaughter-House Cases</u> and <u>Cruikshank</u> may be precedent on the books, but they are not entitled to controlling recognition any more than <u>Bradwell</u> or <u>Plessy</u>.

As historian Flack noted, "the decisions in the above cases have given to the Fourteenth Amendment a meaning quite different from that which many of those who participated in its drafting and ratification intended it to have." Flack, The Adoption of the Fourteenth Amendment 7 (Johns Hopkins 1908).

Professor Antieau is even more blunt about the <u>Slaughter-House Cases</u> majority opinion:

> Of the outrageous decision, a contemporary scholar wrote: 'Ninety-nine out of every hundred educated men, upon reading this (Privileges and Immunities) section over, would at first say that it forbade a state to make or enforce a law which abridged any Privilege or Immunity whatever of one who was a citizen of the United States.'

Antieau, The Intended Significance of the Fourteenth Amendment (Wm. Hein, Buffalo, N.Y. 1997), citing Royall, The Fourteenth Amendment: The Slaughter House Cases, 4 So. L. Rev. (N.S.) 558, 563 (1879).

The District Court erred in dismissing the Complaint because the facts alleged in the Complaint support a viable action under the Fourteenth Amendment Privileges and Immunities Clause as that clause

guarantees a fundamental right to self-expression, including the right to travel, which protects the rights of individuals to travel freely, without causing harm to others, without state-decreed intervention or monopolization.

In conclusion, the arbitrary and discriminatory enforcement of Nevada's Helmet Law and the CFR Standard unjustifiably violates the Plaintiffs' right to travel under the Privileges and Immunities Clause Plaintiffs and this legal issue should not be considered merged with Plaintiffs' original complaint.

**2. A heightened standard of review should be applied to a state statute and code that specifically impacts fundamental rights protected by the Privileges and Immunities Clause and incorporated into the Fourteenth Amendment for additional reasons of travel.**

Since the Nevada Helmet Law and the Defendants' enforcement policies burden a fundamental right, the right to travel, the statute and the Defendants' attendant enforcement policies should receive heightened scrutiny under the Fourteenth Amendment's Equal Protection Clause. Silveira v. Lockyer, 312 F.3d 1052, 1087-8 (9th Cir. 2002).

In drafting both the Constitution and the Bill of Rights, the Framers strove to create a form of Government decidedly different from their British heritage. Whereas the British Parliament was unconstrained,

the Framers intended to create a Government of limited powers. See B. Bailyn, The Ideological Origins of the American Revolution 182 (1967); 1 The Complete Anti–Federalist 65 (H. Storing ed. 1981). The colonists considered the British Government dangerously omnipotent. After all, the British declaration of rights in 1688 had been enacted not by the people, but by Parliament. The Federalist No. 84, p. 439 (M. Beloff ed. 1987). Americans vehemently attacked the notion that rights were matters of "favor and grace," given to the people from the Government. B. Bailyn, supra, at 187 (quoting John Dickinson).

Thus, the Framers of the Bill of Rights did not purport to "create" rights. Rather, they designed the Bill of Rights to prohibit our Government from infringing rights and liberties presumed to be pre-existing. See, e.g., U.S. Const., Amdt. 9 ("The enumeration in the Constitution of certain rights, shall not be construed to deny or disparage others retained by the people"). The Fourth Amendment, for example, does not create a new right of security against unreasonable searches and seizures. It states that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated...." The focus of the Fourth Amendment is on what the Government can and cannot do, and how it may act, not on

36

against whom these actions may be taken. Bestowing rights and delineating protected groups would have been inconsistent with the Drafters' fundamental conception of a Bill of Rights as a limitation on the Government's conduct with respect to all whom it seeks to govern.

In <u>Employment Division v. Smith</u>, 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990), the Court analyzed a free exercise claim under a rational basis test.  However, in <u>Smith</u>, the Court distinguished the strict scrutiny imposed in "hybrid situation[s]" in which a law "involve[s] not the Free Exercise Clause alone, but the Free Exercise Clause in conjunction with other constitutional protections." <u>Smith</u>, 494 U.S. at 881-82, 110 S.Ct. 1595. Here, the Plaintiffs' claim fits within the "hybrid-rights" exception in <u>Smith</u> because there are multiple distinct rights violated by the Defendants' conduct: (i) a vague and ambiguous statutes granting unbridle discretion to law enforcement, (ii) selective enforcement under the Fourth Amendment, (iii) violation of the right to equal protection of the law, (iv) violation of the First Amendment right to free expression and (v) violation of the right to travel under the Privileges and Immunities Clause.

///

///

37

**G. This Court should order, for remand, assessment of 42 U.S.C. § 1988 interim litigation expenses and counsel fees for Appellants prior to trial on the merits of the remaining factual and legal questions.**

In the event that this Court chooses to declare Nevada's Helmet law void for vagueness and unenforceable, the Plaintiffs would be the prevailing party herein.

Based upon 42 U.S.C. § 1988, allowing for the recovery of fees by the prevailing party in any litigation, the Ninth Circuit can exercise this discretion when the successful party has conferred a substantial benefit on a class of individuals, i.e. motorcyclists. See <u>United States for Use & Benefit of Reed v. Callahan</u>, 884 F.2d 1180, 1185 (9th Cir. 1989).

**IX.    <u>CONCLUSION</u>.**

The Defendants are precluded by their collective and individual ignorance of the CFR Standard from having probable cause to cite or prosecute the Plaintiffs. As a result, the Defendants' arbitrary and discriminatory enforcement of the CFR Standard violates the Plaintiffs' First, Fourth and Fourteenth Amendment rights and supports their state law claims.

The District Court erred in failing to consider the ramifications of the Defendants' ignorance of the CFR Standard in (i) dismissing the Complaint with Prejudice and (ii) denying the Plaintiffs the opportunity to

amend their Complaint to cure any defects therein.

The Plaintiffs ask this Circuit Court to (i) determine, as a matter of law, that the Nevada Helmet Law is void for vagueness and unenforceable as written, (ii) determine, as a matter of law, that the Defendants did not have probable cause to cite and prosecute the Plaintiffs for any violation of the CFR Standard, (iii) determine that the Defendants' enforcement of the CFR Standard against the Plaintiffs is arbitrary and discriminatory, (iv) remand the case back to the District Court for additional litigation and discovery or (v) remand the case back to the District Court with an order allowing the Plaintiffs to amend their Complaint to cure any defects.

By: /s/ Travis N. Barrick
Travis N. Barrick, NBN 9257
GALLIAN WILCOX WELKER
OLSON & BECKSTROM, LC
540 E. St. Louis Avenue
Las Vegas, Nevada 89117
Telephone: (702) 892-3500
Facsimile: (702) 386-1946
tbarrick@gwwo.com
Attorneys for Plaintiffs - Appellants

By: /s/ Gary W. Gorski
Gary W. Gorski, CBN 166526
Attorney at Law
1207 Front Street, Suite 22
Sacramento, CA 95814
Telephone: (916) 965-6800
Facsimile: (916) 965-6801
usrugby@pacbell.net
Attorneys for Plaintiffs - Appellants

## STATEMENT OF RELATED CASES

Pursuant to Ninth Circuit Rule 28-2.6, I certify that, to the best of my knowledge, there are no related cases before the Court.

## REQUEST FOR ATTORNEY FEES

Appellants hereby notify the Court of their intention to request attorney fees on appeal based upon 42 U.S.C. § 1988.

## CERTIFICATE OF COMPLIANCE PURSUANT TO FED. R. APP. P. 32 AND CIRCUIT RULE 32-1 FOR CASE NUMBER 09-16852

I certify that pursuant to Fed. R. App. 32 (a)(7) and Ninth Circuit Rule 32-1, the attached opening brief is proportionally spaced, has a typeface of 14 points or more and contains 8,650 words.  Microsoft Word was used to compute the word count.

Dated this 11th day of July, 2012.

By: /s/ Travis N. Barrick
Travis N. Barrick, SBN 9257
Gallian, Wilcox, Welker,
Olson & Beckstrom, LC
540 E St. Louis Avenue
Las Vegas, Nevada 89104
(702) 892-3500
Facsimile: (702) 386-1946
tbarrick@gwwo.com
Attorney for the Appellants

Case No. 12-15603

Certificate of Service by CM/ECF

I hereby certify that on the 11th day of July, 2012, I served the above and

foregoing Appellants' Opening Brief and Excerpts of the Record by filing with

CM/ECF, which lists the following as attorneys of record for the Defendants:

| | |
|---|---|
| Robert J. Gower, Esq.<br>Chief Deputy District Attorney<br>500 S. Grand Central Parkway<br>PO Box 55221<br>Las Vegas, NV 89155-2215<br>702.455.4114direct<br>702.382.5178fax<br>robert.gower@ccdanv.com<br>Attorneys for Clark County | Craig R. Anderson, Esq.<br>Micah S. Echols, Esq.<br>MARQUIS AURBACH COFFING<br>10001 Park Run Drive<br>Las Vegas, NV 89145<br>702.382.0711<br>702.382.5816fax<br>canderson@maclaw.com<br>mechols@maclaw.com<br>Attorneys for Boulder City,<br>Mesquite & North Las Vegas |
| James W. Erbeck, Esq.<br>Chief Deputy City Attorney<br>495 S. Main Street, 6th Floor<br>Las Vegas, NV 89101<br>702.229.6629<br>702.386.1749fax<br>jerbeck@lasvegasnevada.gov<br>Attorneys for the City of Las Vegas | Nancy D. Savage, Esq.<br>City Attorney<br>240 Water Street, MSC 144<br>Henderson, NV 89009-5050<br>702.267.1200<br>702.267.1201fax<br>Nancy.savage@cityofhenderson.com<br>Attorneys for the City of Henderson |

/s/ Travis N. Barrick
Travis N. Barrick, an employee of Gallian,
Wilcox, Welker, Olson & Beckstrom, LC